IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MAREMONT CORPORATION,

    Plaintiff;

v.

ACE PROPERTY & CASUALTY INSURANCE COMPANY; AIU INSURANCE COMPANY; FEDERAL INSURANCE COMPANY; GREAT NORTHERN INSURANCE COMPANY; ST. PAUL MERCURY INSURANCE COMPANY; AND ZURICH INSURANCE COMPANY,

    Defendants.

Civil Action No. 12-1379-RGA

MEMORANDUM OPINION

Jennifer C. Wasson, Esq., Michael B. Rush, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Jason D. Wallach, Esq. (argued), John E. Heintz, Esq., Edward Tessler, Esq., James S. Carter, Esq., Dickstein Shapiro LLP, Washington, D.C., attorneys for Plaintiff.

Bruce W. McCullough, Esq., Bodell Bové, LLC, Wilmington, DE; Antonia B. Ianniello, Esq. (argued), John L. Jacobus, Esq., John R. Casciano, Esq., Steptoe & Johnson, LLP, Washington, D.C., attorneys for Defendant Zurich Insurance Company Ltd.

Jennifer Marie Kinkus, Esq., Timothy Jay Houseal, Esq., Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, attorneys for Defendant AIU Insurance Company.

May 29, 2015

ANDREWS, U.S. DISTRICT JUDGE:

Maremont Corporation brought this declaratory judgment action pursuant to Del. Code Ann. tit. 10, § 6501 against Ace Property & Casualty Insurance Company, AIU Insurance Company, Federal Insurance Company, Great Northern Insurance Company, St. Paul Mercury Insurance Company, and Zurich Insurance Company in Superior Court on October 5, 2012. (D.I. 1, Ex. A). Defendants removed the case to this Court on October 31, 2012. (D.I. 1). On November 26, 2013, the parties stipulated to dismiss Defendants Federal Insurance Company, Great Northern Insurance Company, and St. Paul Mercury Insurance Company. (D.I. 59). On March 26, 2014, the parties stipulated to dismiss Ace Property & Casualty Insurance Company. (D.I. 104).

Presently before the Court are motions for summary judgment. (D.I. 163, 168). Maremont seeks a declaratory judgment that Zurich Insurance Company Ltd. ("ZIC") and AIU Insurance Company are required to defend and indemnify Maremont for asbestos-related claims. (D.I. 1, Ex. A). There are three time periods at issue.[1] Both sides have moved for summary judgment as to the period from July 1, 1985 to July 1, 1986. (D.I. 163, 168). ZIC has moved for summary judgment as to the period from September 1, 1981 to December 31, 1982 and the period from January 1, 1984 to December 31, 1984. (D.I. 163). AIU Insurance Company joined ZIC's motion.[2] (D.I. 166). The matter has been fully briefed. (D.I. 164, 169, 190, 192, 220, 227). The Court heard oral argument on March 20, 2015. (D.I. 286 [hereinafter, "Tr."]).

---

[1] Maremont has stated that there is no dispute as to other time periods. (D.I. 286 at 8-9).
[2] AIU states, without opposition, that its issues are identical to those of ZIC, and it therefore does not present any separate arguments. (D.I. 166 at p. 2). The policies issued by AIU Insurance Company have the same terms and conditions as ZIC's policy. (Id.).

1

For the reasons set forth below, Defendants' motion is **GRANTED IN PART**. Summary judgment is **GRANTED** to ZIC and AIU Insurance Company with respect to the period from January 1, 1984 to December 31, 1984 and the period from July 1, 1985 to July 1, 1986. I withhold judgment on the period from September 1, 1981 to December 31, 1982. Plaintiff's motion for partial summary judgment is **DENIED**.

## BACKGROUND

ZIC sold an insurance policy, SR10007 ("the Swiss Policy"), to Schweizerische Aluminium AG ("Alusuisse") that provided coverage for Alusuisse and its subsidiaries, including Maremont. (D.I. 164 at p. 1). The agreement is governed by Swiss law. (D.I. 171-1 at 20). The Swiss Policy is a high level excess policy which provides coverage excess to U.S. primary and umbrella policies. (D.I. 164 at p. 1). There are two underlying umbrella policies relevant to this suit. For the period from January 1, 1984 to December 31, 1984, Maremont was covered by a U.S. umbrella issued by Transit Casualty Insurance Company. (*Id.* at p. 23). For the period from July 1, 1985 to July 1, 1986, Maremont was covered by a U.S. umbrella issued by Zurich American. (*Id.*).

## LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

2

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

**B.     Applicable Swiss Law**

Contract interpretation under Swiss law requires a two-step inquiry. (D.I. 164 at p. 9; D.I. 192 at p. 21). First, the factfinder must attempt to discern the mutual, subjective intent of

3

the parties. (D.I. 171-2 at 12; D.I. 199 at 7). To make this determination, the factfinder considers all factual evidence offered by the parties. (D.I. 171-2 at 11; D.I. 199 at 6). Mutually agreed-upon intent is a question of fact. (D.I. 171-2 at 13; D.I. 199 at 7). Second, if the subjective intent cannot be determined, the court looks to the objective intent of the parties. (D.I. 171-2 at 13; D.I. 199 at 8). Objective intent is a question of law. (D.I. 171-2 at 14; D.I. 199 at 9).

A court determines objective intent according to the "principle of legitimate expectation," also known as the "principle of trust." (D.I. 171-2 at 13; D.I. 199 at 8). According to that principle, the objective contractual intent is what rational and fair parties would have meant by their behavior, considered in light of all the circumstances. (D.I. 171-2 at 16; D.I. 199 at 8). As the Swiss Federal Court explained,

> The principle of trust enables us to attribute to a party the objective meaning of its statements or behavior, even if that does not correspond to its private intention. . . . The apparently clear meaning of a law is not necessarily decisive, and thus a purely literal interpretation is prohibited. Even if the wording of a contractual clause appears perfectly clear at first sight, it may be deducible from other conditions of the contract, from the purpose of the parties or from other circumstances that the wording of the clause does not exactly reflect the meaning of the agreement. . . . There are however, no grounds for departing from the literal meaning of the wording adopted by the interested parties where there is no serious reason to think that it does not correspond to their intentions.

(D.I. 171-2 at 16).

## ANALYSIS

### A.  Ripeness

At the Court's request, the parties submitted letters regarding whether the case was ripe for adjudication, given that any claim against ZIC would not occur for several years. (D.I. 269, 272). Both parties argued that the case is ripe. The Court agrees. In order for a declaratory

4

judgment action regarding an excess insurance claim to be justiciable, "Delaware law does not require either evidence or proof that the underlying coverage will be exhausted, or that the excess carriers insurance contracts will be triggered." *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, 565 A.2d 956, 960 (Del. Super. 1989); *accord, ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 822-23 (3d Cir. 1981). It is not necessary for an adjudication to result in immediate payment. *ACandS*, 666 F.2d at 823. An "overwhelming number of disputes are resolved by settlement," and a "determination of legal obligations would thus strongly affect present behavior, have present consequences and resolve a present dispute." *Id.*

## B.  September 1, 1981 to December 31, 1982

Defendants argue that Plaintiff is not entitled to coverage for the period from September 1, 1981 to December 31, 1982 due to the Swiss Policy's series loss provisions. (D.I. 164 at p. 1). The Swiss Policy covers losses occurring "during the term of this contract." (D.I. 171-7 at 14). The Swiss Policy's series loss provisions provide that losses arising out of the same cause are treated as a single loss. (D.I. 171-7 at 13). The loss is treated as occurring when the first loss in the series occurs. (*Id.* at 14). Defendants argue that because Maremont's first asbestos loss occurred before 1981, the series loss provisions bar coverage. (D.I. 164 at pp. 6-7).

Defendants note that the former ZIC underwriters who were involved in underwriting the Swiss Policy—Willi Schuerpf, Peter Knecht, and Hans Fleck—all testified that they intended the series loss provisions to apply retroactively, so that there would be no coverage if the first loss in a series occurred before the inception of the policy. (*Id.* at p. 14). Defendants argue that ZIC had no subjective intent as to whether the series loss provisions would exclude asbestos in particular because they were not considering asbestos. (Tr. 69). As such, there could be no subjective intent either way as to asbestos coverage. (*Id.*).

5

Plaintiff responds that the series loss provisions were intended to apply prospectively. (D.I. 192 at p. 30). That is to say, all asbestos losses were intended to date back to the first loss occurring after the inception of the policy. Plaintiff argues that ZIC knew Maremont had asbestos claims prior to September 1, 1981. (*Id.* at pp. 30-31). Plaintiff contends that if ZIC had intended to bar asbestos coverage when it knew Maremont had asbestos claims, it would have done so with an explicit asbestos exclusion. (*Id.* at p. 31).

Plaintiff also notes that in 1983, Alusuisse was attempting to get Zurich American to remove an asbestos exclusion from an underlying U.S. umbrella policy in order to get coverage for Maremont. (*Id.* at p. 31; D.I. 196-5 at 10, 52; D.I. 197-1 at 15). In a September 22, 1983 letter from Zurich American underwriter Richard Berger to ZIC underwriters Mr. Schuerpf and Mr. Knecht, Mr. Berger asked (1) whether ZIC would provide reinsurance for the umbrella and (2) whether the Swiss Policy provided coverage for asbestos-related claims. (D.I. 196-5 at 7-8). A handwritten note by Mr. Knecht next to the first question read "no!" and a note next to the second question read "yes." (*Id.* at 8; D.I. 196 at 20). In response to Mr. Berger's letter, ZIC advised Zurich American to maintain the asbestos exclusion in the Zurich American U.S. umbrella and confirmed that the Swiss Policy had no asbestos exclusion. (D.I. 196-5 at 10). In light of the Maremont situation, ZIC considered adding an asbestos exclusion to the Swiss Policy in 1983. (*Id.* at 52; D.I. 197-1 at 15). ZIC ultimately chose not to do so. (D.I. 197-1 at 21, 23). Plaintiff argues that, if ZIC had intended that the series loss provisions would bar asbestos coverage, there would have been no need to consider adding an express asbestos exclusion in 1983. (Tr. 54-55).

I do not think that there is any evidence from which a jury could find that the parties had a shared subjective intent with respect to whether asbestos claims would be excluded by the

6

series loss provisions. There is insufficient evidence of Alusuisse's intention. The only evidence in the record is that Alusuisse was seeking the broadest coverage available. (D.I. 195-3 at 4; D.I. 198 at 5). I do not think that demonstrates that Alusuisse had a particular subjective intention with respect to the series loss provisions.

ZIC's subjective intent is not entirely clear. The ZIC underwriters testified that ZIC intended that the series loss provisions would bar coverage for a series loss if the first loss in the series occurred before the inception of the contract. (D.I. 164 at p. 14). Nevertheless, in June 1981, Mr. Schuerpf was aware that Maremont was a subsidiary of Alusuisse and that it had asbestos claims. (D.I. 195-5 at 56). The series loss provisions were standard clauses in ZIC's contracts. (D.I. 192 at p. 30). For ZIC to rely on a standard clause to exclude asbestos, rather doing so by than adding an asbestos exclusion, seems odd. In addition, the fact that ZIC later considered adding an asbestos exclusion is potentially inconsistent with the position that asbestos was already excluded.

Since there is no triable issue of fact on subjective intent, I turn to objective intent. Determining the objective intent requires applying Swiss law, and the parties' Swiss law experts dispute a number of issues critical to interpretation. Pursuant to Rule 706, a court has discretion to appoint an independent expert witness. FED. R. EVID. 706. "The most important factor in favor of appointing an expert is that the case involves a complex or esoteric subject beyond the trier-of-fact's ability to adequately understand without expert assistance." *Ford v. Mercer Cnty. Corr. Ctr.*, 171 F. App'x 416, 420 (3d Cir. 2006) (quoting 29 Charles Allen Wright & Victor James Gold, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6304 (1997)). Swiss insurance law (written in German) seems to me to be an appropriate topic for expert assistance. I will

7

therefore appoint a Swiss law expert to address the following four issues about which the parties' Swiss law experts disagree.

First, the expert shall determine the effect of the Article 33 Insurance Contract Act. The Article 33 ICA provides, "an insurer is liable for all events that display the characteristics of the risk for which the insurance was taken out unless the contract excludes particular events from the insurance in a precise and unambiguous way." (D.I. 228-1 at 7). Plaintiff's expert contends that Article 33 ICA applies to any restriction of coverage. (D.I. 193 at 13). Since the series loss provisions restrict coverage, Plaintiff's expert maintains that they must be read narrowly. (*Id.*). Defendants' expert contends that Article 33 ICA is limited to exclusion clauses. (D.I. 228-1 at 17). He argues that it therefore does not apply to provisions defining the general operation of the policy. (*Id.* at 18).

Second, the Swiss law expert shall address whether the unusualness rule should be applied in interpreting the series loss provisions. The unusualness rule provides that unusual provisions are excluded from a policy's terms and conditions unless they are specifically pointed out to the insured. (D.I. 199 at 11). Plaintiff's expert argues that the series loss provisions are unusual and thus must not be used to preclude coverage. (D.I. 199 at 18-20). Defendants' expert maintains that the rule is inapplicable because the Swiss Policy was individually negotiated. (D.I. 280 at 26).

Third, the expert shall determine whether the ambiguity rule applies. The ambiguity rule provides that where a term has two possible interpretations, it is interpreted in favor of the weaker party. (D.I. 199 at 10). The rule applies to general terms and conditions, but not to individually negotiated contracts. (D.I. 280 at 6). Defendants' expert argues that it therefore does not apply in this case, because the contract was extensively negotiated. (*Id.* at 18).

8

Plaintiff's expert maintains that, even if some parts of a contract are negotiated, the ambiguity rule applies to standard terms. (D.I. 250 at 15-16).

Finally, the Swiss law expert shall determine the effect of reliance liability. Plaintiff's expert maintains that the Swiss law principle of reliance liability dictates that Maremont's asbestos claims be covered. The Swiss Federal Court held that reliance liability applies to insurance. (D.I. 193 at 26). It held that where an insurer had considered adding a specific exclusion for a pre-existing illness, but ultimately did not do so, it had created a justifiable reliance that the illness was covered and coverage could not be excluded on the ground that the illness was a pre-existing condition. (*Id.*). Defendants' expert argues that an individual insured is different from a sophisticated corporate party, and the principle of reliance liability does not compel the same result. (D.I. 280 at 37).

The parties shall jointly find a qualified expert and evenly share the costs.

## C. January 1, 1984 to December 31, 1984

Effective January 1, 1984, the Swiss Policy was amended by Endorsement 14:

<u>Article 2 letter k "Drop down"</u> is amended in relation to the US companies as follows:

In case the insurance sum of the local US umbrella in the equivalent of US$5 million for all companies domiciled in the USA is exhausted, this insurance assumes the function of the "Zurich American" umbrella under the conditions of that policy.

The conditions of the US umbrella also obtain for the portion of a loss exceeding $5 million (following form).

(D.I. 171-7 at 35). Defendants argue that Maremont is not entitled to asbestos coverage under Endorsement 14 for two reasons. First, Endorsement 14 only drops down to the local U.S. umbrella if the umbrella is "exhausted." (D.I. 164 at p. 33). Defendants argue that exhaustion requires that the insurer pay out the full policy limit, which Plaintiff cannot show. (*Id.* at pp. 33-

9

34). Second, Defendants argue that Endorsement 14 drops down only to a Zurich American umbrella policy, not to any U.S. umbrella policy. (*Id.* at p. 23). From January 1, 1984 to December 31, 1984, Plaintiff's U.S. umbrella issued from Transit Casualty Insurance Company, not Zurich American. (*Id.*). The Transit policy was to Maremont only, not to all Alusuisse subsidiaries. (D.I. 197-5 at 56).

1. Exhaustion

Defendants argue that Endorsement 14's exhaustion requirement precludes coverage. (D.I. 164 at p. 33). Endorsement 14 drops down only when the local U.S. umbrella is "exhausted." (*Id.*). Defendants maintain that exhaustion requires actual payment by the insurer. (*Id.*). It is undisputed that Transit has not paid the full policy limit. (*Id.* at p. 34). Transit went into liquidation in 1985, and Maremont received approximately $1.4 million as part of the liquidation plan. (*Id.*). The policy limit was $5 million, so the settlement left $3.6 million of the policy unpaid. (*Id.*). Because the limit was not paid in full by Transit, Defendants argue that the policy has not been "exhausted." Defendants note that the ZIC underwriters testified that they subjectively intended exhaustion to mean actual payment by the insurer. (*Id.* at p. 33). Defendants also note that the underwriters did not discuss what would happen if an insurer became insolvent. (Tr. 115).

Plaintiff responds that exhaustion does not require actual payment by the insurer. (D.I. 192 at p. 26). Plaintiff argues that a policy is exhausted as long as the underlying limits are paid out by someone. (Tr. 109). Plaintiff further argues that the ZIC underwriters' testimony does not prove the parties' mutual subjective intent. (D.I. 192 at p. 27). Subjective intent must be based on the intentions of both parties. (*Id.*). Since Defendants have offered no evidence of Alusuisse's intent, Plaintiff maintains that issues of material fact preclude summary judgment.

10

(*Id.*). In addition, Plaintiff argues that an objective reading of the contract does not demonstrate that exhaustion requires the insurer to pay the full limits of the policy. (*Id.*). Plaintiff argues that "exhausted" is broad and unqualified, and therefore not limited to actual payment by the insurer. (*Id.*). Plaintiff further argues that requiring full payment by the insurer would give ZIC an extraordinary windfall. (*Id.*).

The evidence is undisputed that the parties did not have a shared subjective intent as to whether an underlying policy would be "exhausted" if the insurer became insolvent, because there is no evidence that the parties considered that situation. I will therefore turn to objective intent. As discussed above, the principle of legitimate expectation looks to what rational and fair parties would have meant by their actions. (D.I. 171-2 at 16; D.I. 199 at 8). There is no evidence that who pays the $5 million underlying the Swiss Policy materially alters ZIC's risk. Reasonable parties would expect that the excess coverage would kick in after $5 million was paid. There is zero chance that sophisticated contracting parties would insert a wildcard into the contract that relieves ZIC of its obligations due to an event over which the parties had no control. I therefore hold, as a matter of contractual interpretation, using the Swiss law principle of legitimate expectation, that exhaustion requires $5 million in payments; it does not, however, require that the "local US umbrella" insurer make the $5 million in payments itself when it is unable to do so because of its bankruptcy.[3]

2. Transit Policy

Defendants argue that the history of Endorsement 14 shows that the parties subjectively intended that the Swiss Policy would drop down only to a Zurich American umbrella. The June 27, 1984 written offer to Alusuisse that eventually became Endorsement 14 stated, "The master

---

[3] Maremont does not assert that ZIC owes it any part of the $3.6 million that it paid out of pocket. (Tr. 100-01)

11

agreement will take over 'following form' of the U.S. umbrella of 'Zurich American.'" (D.I. 164 at p. 24 (quoting D.I. 171-8 at 10)). On June 29, 1984, ZIC's Mr. Knecht sent a telex to Zurich American's Mr. Berger confirming that ZIC had offered to amend the Swiss Policy so it dropped down "following form of yr US umbrella." (D.I. 171-8 at 14). Mr. Knecht testified that "yr" was an abbreviation of "your." (D.I. 164 at p. 24 n.17).

Plaintiff responds that the parties subjectively intended for the Swiss Policy to drop down to any local umbrella policy, including the Transit policy. (D.I. 192 at p. 23). Plaintiff notes that ZIC knew Maremont was going to purchase the Transit policy when it wrote Endorsement 14, and therefore intended for it to drop down to the Transit policy. (*Id.*). Plaintiff also notes that ZIC contributed $50,000 towards the premium of the Transit policy. (*Id.*). Plaintiff argues that Alusuisse's history of concern with coverage gaps demonstrates its intent that the Swiss Policy would drop down to the Transit policy. (*Id.* at p. 24).

I find that the undisputed facts demonstrate that there was no meeting of the minds, and thus a shared subjective intent cannot be found. ZIC's subjective intent was that the Swiss Policy would drop down only to a Zurich American umbrella. (D.I. 164 at p. 25). Alusuisse's subjective intent was that the Swiss Policy would drop down to any U.S. umbrella. (D.I. 192 at p. 26). There is no evidence that the parties shared a subjective intent. I will therefore turn to the parties' objective intent.

Both parties' Swiss law experts agree that the Court should look first at the wording of the contract to determine objective intent, though the wording is not dispositive. (D.I. 171-2 at 14; D.I. 199 at 9). I find that the contract indicates an objective intent to drop down only to a Zurich American umbrella. Plaintiff's interpretation writes out the second clause of the first sentence of Endorsement 14 entirely. If the parties had intended the policy to drop down to any

12

U.S. umbrella, they would not have specified that the policy "assumes the function of the 'Zurich American' umbrella under the conditions of that policy."

Under Swiss law, the wording of a contract must be interpreted in light of the overall context. However, the wording cannot be lightly departed from if there is no reason to believe that the parties, acting in good faith, meant something different. I do not see good reason to depart from the clear meaning of the contract. ZIC agreed to pay part of the Transit premium in order to "get of[f] the hook" for Maremont's asbestos coverage. (D.I. 196-5 at 52). In addition, the offer expressly indicated that the policy would drop down to a Zurich American umbrella. Even if Alusuisse's "private intention" was for the policy to drop down to any U.S. umbrella, the objective meaning of its behavior in accepting that offer demonstrates an objective intent for the policy to drop down only to a Zurich American umbrella. (*See* D.I. 171-2 at 16). I therefore grant summary judgment for Defendants as to the period from January 1, 1984 to December 31, 1984.

### D.     January 1, 1985 to June 30, 1986

Both parties moved for summary judgment as to whether Maremont's asbestos claims were covered for the period from July 1, 1985 to July 1, 1986. (D.I. 163, 168). During that time, Maremont was insured by a Zurich American umbrella policy. Effective July 1, 1985, Section 2(k) of the Swiss Policy was amended by Endorsement 20. (D.I. 164 at p. 27). Endorsement 20 was the same as Endorsement 14, other than a reduction in the liability limits from $5 million to $3 million. (*Id.*). The parties agree that the Zurich American umbrella is governed by U.S. law, but disagree as to which law applies. (D.I. 243 at p. 2; D.I. 245 at p. 3). I need not decide which state's law applies, as there is no conflict with respect to the relevant principles of contractual interpretation among New York, Illinois, and Delaware law.

13

Defendants argue that Maremont is not entitled to coverage under the Zurich American umbrella for two reasons. First, Defendants argue that exhaustion requires actual payment by the insurer. (D.I. 164 at p. 34). Zurich American has not paid out the full $3 million policy limit, and Defendants maintain that the policy is therefore not exhausted. (*Id.*). Plaintiff argues that it has already incurred sufficient liability to exhaust the umbrella. (Tr. 21-22). Though it has not yet filed any claims against Zurich American, Plaintiff contends that it has paid sufficient amounts out of pocket to exhaust the $3 million limit. (D.I. 269 at 8). Defendants respond that the out-of-pocket payments were for self-insured retentions which Maremont was required to pay pursuant to certain other insurance policies. (D.I. 272 at p. 2 n.2).

Because Zurich American remains solvent, the exhaustion issue differs from that with respect to Endorsement 14. The parties contracted for insurance excess to the umbrella policy. Since the umbrella insurer is still capable of paying if Maremont pursues coverage, ZIC has no obligations until Zurich American pays out the $3 million policy limit.

Second, Defendants argue that coverage is excluded by the Zurich American umbrella's Products and Completed Operations Limitation, which states: "This policy does not apply to personal injury or to property damage resulting from the products hazard or the completed operations hazard except when coverage is available to you in the underlying insurances as shown in the schedule of underlying insurance and then only in excess thereof." (D.I. 164 at p. 28 (emphasis omitted) (quoting D.I. 172-3 at 29)). The Zurich American umbrella defines "Product Hazard" as including "personal injury and property damage arising out of the insured products . . . ." (D.I. 172-3 at 7). Defendants argue that asbestos claims fall within the

14

definition of products hazard, and are therefore excluded from coverage. (D.I. 164 at p. 29). Plaintiff does not dispute that the asbestos claims are product hazard claims.

Defendants further argue that the exception to the products limitation does not provide coverage. (*Id.* at pp. 30-31). The only underlying insurance in the schedule of underlying insurance that covers Maremont is Policy CGL-3018689-02 ("Primary Policy"). (*Id.* at p. 31). The Primary Policy contains an asbestos exclusion:

> It is understood and agreed that as respects Maremont Corporation and past and present subsidiaries, there is no coverage under this policy for any claims, which may arise because of exposure to asbestos or the manifestation of any disease, relating to the exposure to asbestos during the policy period or at any time prior to the policy period.

(D.I. 172-2 at 39). Defendants argue that this provision means that coverage is not "available to [Maremont]" as required by the exception. (D.I. 164 at p. 31).

Plaintiff argues that the product limitation does not provide that it follows form to the underlying insurance, and the asbestos exclusion in the Primary Policy therefore does not bar coverage. (D.I. 220 at p. 2). In addition, Plaintiff argues that the limitation provides coverage for products hazards "as shown in the schedule of underlying insurance." (*Id.*). The box next to "Products and Completed Operations" on the schedule of underlying insurance is checked. (Tr. 146). Plaintiff argues that there is no need to look beyond the four corners of the document, which indicates that the Primary Policy has products hazard coverage. (Tr. 146). Plaintiff also notes that both the Primary Policy and the Zurich American umbrella contain virtually identical exclusions with respect to aircraft liability. (D.I. 169 at p. 12). Plaintiff argues that if the product limitation incorporated the Primary Policy's exclusions, there would be no need to include an aircraft exclusion in both policies. (*Id.*).

15

Defendants respond that it is necessary to include aircraft exclusions in both policies because the exclusion is broader than just personal injury resulting from product hazards. (Tr. 182). As such, the umbrella's product limitation would not capture the full scope of the exclusion. (*Id.*). Defendants also argue that it is necessary to look beyond the four corners of the Zurich American umbrella. (*Id.* at 173). Defendants note that Maremont is not listed on the schedule of underlying insurance, so it is necessary to look to the Primary Policy to know whether Maremont is insured at all. (*Id.*).

I find that the Zurich American umbrella does not provide coverage for Maremont's asbestos claims.[4] The exception to the products limitation provides excess coverage if such coverage is available in an underlying policy. In this case, the underlying policy expressly excludes asbestos. Coverage for asbestos is therefore not available in the Primary Policy. I do not agree with Plaintiff's argument that excess coverage for all products hazards is available if the box next to "Products and Completed Operations" on the schedule of underlying insurance is checked, irrespective of the actual terms of the primary policy. That interpretation would provide broad umbrella coverage for all product hazards even if a primary policy provided coverage solely for personal injury in a few narrow, defined circumstances. I do not think that is a reasonable interpretation. It seems clear to me that the only reasonable understanding of the schedule is that it was meant to identify the underlying policies, not to rewrite them into one paragraph each.

### E.     Affirmative Defenses

---

[4] New York, Illinois, and Delaware law do conflict as to what triggers coverage and how payment is allocated. Because I find that the policy does not provide coverage for asbestos, it is not necessary to determine how coverage would be triggered or payment allocated.

16

Plaintiff also requests that I dismiss twenty-eight of Defendants' affirmative defenses because they lack factual basis or because ZIC's 30(b)(6) representative did not understand them. (D.I. 169 at pp. 19-20). Defendants respond that the factual record supports the defenses that are not claim specific. (D.I. 190 at p. 20). With respect to claim-specific defenses, Defendants argue that they cannot provide factual support until Maremont files claims. (*Id.*).

Plaintiff's request is denied. I do not find Plaintiff's unsupported assertion that there is no factual basis for several of Defendants' defenses sufficient to demonstrate that there are no genuine issues of material fact. In addition, the fact that a corporate representative does not understand legal terms of art is not a ground to dismiss a defense.

## CONCLUSION

For the reasons set forth herein, Defendants' motion is **GRANTED IN PART**. Summary judgment is **GRANTED** to Zurich Insurance Company and AIU Insurance Company with respect to the period from January 1, 1984 to December 31, 1984 and the period from July 1, 1985 to July 1, 1986. I withhold judgment on the period from September 1, 1981 to December 31, 1982 until a report is filed by the Swiss law expert to be appointed.

Plaintiff's motion for partial summary judgment is **DENIED**. An appropriate order will be entered.